UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

PAUL BURNS, Jr.,

                     Plaintiff,                           Case No. 1:14-cv-733

v.

                                                  Honorable Gordon J. Quist

DANIEL H. HEYNS et al.,

                     Defendants.

_____/

**OPINION**

      This is a civil rights action brought by a state prisoner.  The Court has granted Plaintiff leave to proceed *in forma pauperis*.  It has also denied Plaintiff's motion for a preliminary injunction.  Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, Plaintiff's action will be dismissed.  The claims arising under federal law will be dismissed for failure to state a claim.  The claims arising under state law will be dismissed because the Court declines to exercise supplemental jurisdiction over them.

      Also before the Court is Plaintiff's motion to certify the case as a class action (docket #11) and a request for appointment of counsel (Am. Compl., docket #9, Page ID#115). Plaintiff's motion and his request for appointment of counsel will be denied.

## Factual Allegations

Plaintiff, Paul Burns, Jr., is incarcerated by the Michigan Department of Corrections (MDOC). In this action, he sues MDOC Director Daniel H. Heyns and various unnamed MDOC officials who are identified as "Executive Management Team, Administrative Management Team, Wardens . . . Local Functionaries, Librarians, [and] Staff Member Designees." (Am. Compl., docket #9, Page ID#48.)

I. Plaintiff

Plaintiff contends that he is a disabled prisoner with a history of "traumatic brain injury," which resulted in "learning [and] memory deficit, confusion, contextual difficulties, and [difficulties in] ability to reason." (*Id.* at Page ID##49.) Plaintiff asserts that he experienced a brain injury in 2011, after which he fell into a coma for 18 days. (*Id.* at Page ID#106.) When he regained consciousness, he found that he "could not walk, lost balance, lost memory, ability to form new memory, suffered confusion, contextual difficulties, and inability to reason appropriately . . . ." (*Id.* at Page ID#107.) He has apparently recovered somewhat since that time, judging from the extensive allegations and numerous claims set forth in his 70-page complaint, but he alleges that he continues to suffer some degree of "anomia" ("difficulty using words or processing what words mean"), "ataxia" ("lack of coordination"), "apraxia" ("difficulty [doing] common task[s]"), "quadriparesis" ("fatigue and weakness in all four limbs"), headaches, depression, and personality changes. (*Id.* at Page ID#108.) Plaintiff asserts that he has difficulty caring for himself, concentrating, processing information, remembering the location of physical objects, performing tasks that require sustained concentration and memory of time, walking (if it requires navigation of directions; also, it makes him tired within 1 to 2 hours), learning, reasoning, and forming new memories. (*Id.* at Page ID#109.)

II. DOM 2014-31

Plaintiff's action primarily concerns "Director's Office Memorandum 2014-31," which was issued by Defendant Heyns on June 27, 2014 ("DOM 2014-31"). (*See* DOM 2014-31, docket #9-1, Page ID#118.) According to the memorandum, the MDOC has implemented an electronic law library ("ELL") for prisoners in the general prison population to use for their legal research, in addition to hard copy materials. Because usage of the ELL "dramatically increased the speed and ease" by which prisoners are able to conduct legal research, Director Heyns determined that the policy governing law library access by prisoners, MDOC Policy Directive 05.03.115, could be changed. (*Id.*) Prior to the DOM, the policy provided that prisoners housed in the general population would be afforded a minimum of "at least six hours per week of law library use, in sessions of not less than two hours each . . . ." MDOC Policy Directive 05.03.115 ¶ L (effective Nov. 1, 2010). DOM 2014-31 reduced the minimum requirements to *four* hours per week in the law library, in sessions of at least *one* hour. (DOM 2014-31, docket #3-1.) However, prisoners would be allowed to use the library in longer sessions "if resources permit," or as set forth in Policy Directive 05.03.115 ¶ O. (*Id.*) The latter provides:

> A prisoner who has direct access to the main law library and has a court deadline requiring additional time in the law library may request additional time from the librarian or designee. The prisoner may be required to present documentation supporting the need for the additional time. Additional time shall be granted if there is a demonstrated need for the additional time. The additional hours are to be scheduled outside the prisoner's assignment hours when possible.

MDOC Policy Directive 05.03.115 ¶ O (Nov. 1, 2010).

In addition, the DOM 2014-31 states that the MDOC will be removing "hard copy publications" and that prisoners "who are still not adept at using the ELL" will learn how to use it with the assistance of law library staff and prisoner law library clerks. (*See* docket #3-1.)

- 3 -

While Plaintiff's action was pending in this Court, DOM 2014-31 was superceded by DOM 2015-23 (effective Jan. 1, 2015). The latter contains much of the same language as DOM 2014-31, including the reduction in library time, but provides that "hard copy" materials will be retained during implementation of the ELL and will not be updated, "except for those publications received from LexisNexis that are provided under the ELL contract."[1]  DOM 2015-23.

III.  ELL

Several of Plaintiff's claims stem from the fact that many prisoners are now required to conduct legal research using the ELL instead of hard copy materials. According to Plaintiff, prisoners access the ELL through computer workstations in the law library. A prisoner must "sign in" to a workstation before using it. (Am. Compl., Page ID#90.) After signing in, the prisoner is able to access a Lexis-Nexis database using a browser. (*Id.*) Prisoners are then able to "retrieve law and read cases, statutes [and] constitutional provisions," but they are not able to take notes on the workstation or create documents. (*Id.* at Page ID##93-94.) Indeed, prisoners cannot "cut-and-paste, highlight and print, or print any case law." (*Id.* at Page ID#94.) If a prisoner wishes to take notes, he must do so "manually . . . with pen and paper, same as hard copy publication research[.]" (*Id.*)

Because the ELL workstations are connected to a network, Plaintiff contends that activity on the workstation can be monitored and/or tracked from a remote location by prison officials, the database vendor, or third parties. (*Id.* at Page ID##88, 94.) According to Plaintiff, usage of the workstation generates "clickstream data," which is information showing "the time, order and duration the computer spent on each web page as well as which files were accessed and/or downloaded . . . i.e., Shepardized." (*Id.* at Page ID#88.) Plaintiff states that it is the "local policy"

---

[1]DOM 2015-23 is available on the MDOC's website at http://www.michigan.gov/corrections/0,1607,7-119-1441_44369---,00.html (visited Apr. 23, 2015).

of library staff to monitor prisoners' activity on the workstations.  (*Id.* at Page ID#90.)  Plaintiff notes that signs on the workstations state that "ELL computers are ONLY for conducting legal research . . . ANY misuse will result in a misconduct and/or privileges will be restricted or terminated."  (*Id.* at Page ID#74.)  Plaintiff suspects that library staff have the ability to view the clickstream data at any given time from computers in their offices, in order to monitor usage of the ELL.

IV. <u>Plaintiff's claims</u>

Plaintiff claims that DOM 2014-31 (now replaced by DOM 2015-23) is facially invalid and invalid as applied to him.  Plaintiff's action challenges both the fact that the DOM reduces the minimum hourly requirements for access to the law library and the fact that it authorizes a transition from hard copy materials to an electronic library system.  Plaintiff claims that the reduction in access to the law library deprives him of rights guaranteed by the First Amendment (access to the courts and freedom of speech).  He also contends that the requirement to use a monitored, electronic system violates his rights under the Fourth Amendment (right not to be subject to unreasonable searches and seizures), the Fifth Amendment (right not to be compelled to give incriminating statements, and right to counsel during custodial interrogations), the Sixth Amendment (right to privacy of attorney-client communications), the Eighth Amendment, and the Fourteenth Amendment (right to informational privacy, right to due process, and right to equal protection).  He also claims that the DOM, on its face and as implemented by Defendants, violates his rights under Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act, 29 U.S.C. 794(a), Title I of the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2510–2522, Title II of the ECPA (the Stored Communications Act), 18 U.S.C. § 2701

et seq., the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and state law.  As relief, he seeks

damages, a declaratory judgment, and an injunction.

**Discussion**

V.    Class certification

Plaintiff asks the Court to certify the case as a class action filed on behalf of an

unidentified class of individuals (docket #11).  For a case to proceed as a class action, the court must

be satisfied on a number of grounds, including the adequacy of class representation.  *See* Fed. R.

Civ. P. 23(a)(4).  It is well established that *pro se* litigants are inappropriate representatives of the

interests of others.  *See Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009)

(citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)); *see also Dodson v. Wilkinson*,

304 F. App'x 434, 438 (6th Cir. 2008); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003);

*Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Howard v. Dougan*, No. 99-2232, 2000 WL

876770, at *1 (6th Cir. June 23, 2000).  Because Plaintiff is an incarcerated *pro se* litigant, the Court

finds that he is not an appropriate representative of a class.  Moreover, Plaintiff does not identify the

class he purports to represent, let alone show that the class meets the other criteria in Rule 23(a).

*See* Fed. R. Civ. P. 23(a)(1)-(3) (requiring a class so "numerous" that joinder is impracticable,

questions of fact or law that are common to the class, and claims or defenses of the representative

parties that are typical for the class).  Therefore, the Court will deny Plaintiff's motion for class

certification.

VI.    Appointment of Counsel

Plaintiff also requests appointment of counsel to represent him in this action.

Indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-*

*Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d

- 6 -

601, 604-05 (6th Cir. 1993).  The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604-05; *see Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606.  At this stage of the proceedings, the assistance of counsel does not appear to be necessary for the presentation of Plaintiff's position.  Accordingly, Plaintiff's request for appointment of counsel will be denied.

VII.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

Plaintiff purports to assert a facial challenge to the policy as well as a challenge to the policy as applied to him.  In order to demonstrate that a policy is facially invalid, a "challenger must establish that no set of circumstances exists under which the [policy] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "In an as-applied challenge, 'the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be [invalid].'" *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194 (6th Cir. 1997) (quoting *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting)).

## A.  42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### 1.  Access to the Courts

Plaintiff claims that the DOM's reduction in the minimum hours of law library time violates his right of access to the courts.  It is well established that prisoners have a constitutional

right of access to the courts. *Thaddeus-X v. Blatter*, 175 F3d 378, 391 (6th Cir. 1999) (citing *inter alia Lewis v. Casey*, 518 U.S. 343 (1996), and *Bounds v. Smith*, 430 U.S. 817, 821-24 (1977)). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Bounds*, 430 U.S. at 817. The Court held that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis*, 518 U.S. at 349; *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416.

Plaintiff's facial challenge to the reduction in hours in the DOM is meritless because the policy does not reduce the total amount of hours that prisoners are allowed to spend in the law

- 9 -

library.  It reduces the *minimum* amount of time that *must* be afforded to them on a weekly basis, but it allows for additional time if resources are available.  In addition, it expressly incorporates Policy Directive 05.03.115, which requires prison staff to provide additional time if there is a demonstrated need for it.  *Id.* ¶ O ("Additional time *shall* be granted if there is a demonstrated need for the additional time.") (emphasis added).

        Even assuming that, in practical effect, the DOM reduces Plaintiff's available library time, he does not state a claim because the Constitution protects a prisoner's right of access to the *courts*, not to the prison library.  *Walker v. Mintzes*, 771 F.2d 920, 931 (6th Cir. 1985); *see also Lewis*, 518 U.S. at 351 (a sub-par library or legal assistance program does not establish relevant actual injury).  "There is no constitutional right to any particular number of hours in the law library." *Thomas v. Campbell*, 12 F. App'x 295, 297 (6th Cir. 2001) (citing *Walker*, 771 F.2d at 932).  Thus, a reduction in the number of available hours to access the law library is not itself a constitutional violation.  *Walker*, 771 F.3d at 932.  Such a limitation is unconstitutional only when it impedes access to the courts; that is, when it results in "actual injury" to a pending or contemplated legal claim.  *See Lewis*, 518 U.S. at 351-53.

        In *Walker*, some of the plaintiffs were restricted to just one hour of time in the prison law library per week.  *See Walker*, 771 F.2d at 931-32.  The court held that those restrictions were constitutional so long as they did not deny a prisoner's access to the courts.  *Id.* at 932.  Likewise, assuming that the DOM reduced Plaintiff's access to the law library from six hours per week to four hours per week, Plaintiff does not state a claim unless he suffered actual injury to a non-frivolous legal claim.

        Plaintiff asserts that he suffers from the effects of a brain injury, which impair his ability to learn, remember, and reason; consequently, he needs "more time" to prepare his pleadings. (Am. Compl., docket #9, Page ID#49.)  As indicated, however, the policy allows for additional time

as resources permit, or where the prisoner has a court deadline and the prisoner demonstrates a need

for additional time.  MDOC Policy Directive 05.03.113 ¶ O.  Thus, it does not prevent Plaintiff from

requesting and obtaining additional time if he needs it due to his physical limitations.

Plaintiff also complains that the policy puts the burden on the prisoner to justify the

need for additional time, but this burden raises no constitutional concern.  "Prison regulations [may]

reasonably limit the times, places, and manner in which inmates may engage in legal research and

preparation of leg[a]l papers so long as the regulations do not frustrate access to the courts."

*Walker*, 771 F.2d at 932 (quoting *Twyman v. Crisp*, 524 F.2d 352, 358 (10th Cir. 1978)).  In *Walker*,

the Sixth Circuit found no constitutional violation where the prison's policy allowed for "additional

[legal] assistance to any prisoner who demonstrates a need."  *Id.*  Similarly, the DOM's requirement

that prisoners demonstrate a need for receiving additional time in the law library is a reasonable

limitation.  Given that the law library is a resource that must be shared by many prisoners at the

facility, prison administrators have a legitimate interest in making sure that it is available for use by

those who need it most.  Allocating a minimum amount of time and then requiring prisoners to

demonstrate a need for more is reasonably related to that interest.

Plaintiff asserts that some prison officials have interpreted "court deadline" in the

policy narrowly to include only a court-ordered deadline.  (*See* Mot. for TRO, docket #6, Page

ID#29.)  Plaintiff alleges that he was pursuing a civil rights claim and requested financial

documentation from prison staff to apply to proceed *in forma pauperis* in accordance with 28 U.S.C.

§ 1915(a).  His request for additional time in the law library was rejected by a law library employee,

who apparently determined that Plaintiff did not need additional time because his court-ordered

deadline expired in 28 days.  Plaintiff contends that his financial documentation (a certificate of

account activity) subsequently expired and then he missed an unidentified filing deadline.

Plaintiff's allegations do not undermine the validity of the policy or state a claim against Defendants. Even if he missed a filing deadline for his application to proceed *in forma pauperis*, Plaintiff does not allege any injury; that is, he does not allege that the failure to meet the court-ordered deadline prevented him from pursuing his claim. Moreover, he does not allege any details about the underlying claims in that case which would indicate that they were not frivolous, as required by *Christopher*.

Plaintiff also alleges that he was falsely arrested, falsely imprisoned, and maliciously prosecuted in September 2012, and that the statute of limitations for these claims expired in September 2014. Plaintiff contends that "two years of unconstitutional limitations set by Defendant" and "interference" by "Defendant" as a result of the DOM, caused Plaintiff to forfeit his claim. (Am. Compl., Page ID#76.) The foregoing allegations are unsupported by any facts from which to infer that Defendants, or their policies, were the cause of Plaintiff's inability to pursue a timely claim. Indeed, the DOM was issued in June 2014, just a few months before the statute of limitations allegedly expired. Plaintiff does not explain how Defendants, or their policies, prevented him from pursuing a claim from the time that his claim arose in September 2012 until June 2014. Moreover, Plaintiff's reference to the *type*s of claims he was pursuing, without more, does not satisfy the pleading requirements set forth in *Christopher*.

Plaintiff also contends that law library staff "routinely" reject requests for additional time to research "major misconduct appeals or tickets, grievance appeals, or anything deemed to be an[] 'administrative deadline[.]'" (Mot. for TRO, docket #6, Page ID#30.) However, the right of access to the *courts* does not encompass a right of access to prison administrative proceedings. "[A] prisoner's right to access the courts extends to direct appeals [from criminal convictions], habeas corpus applications, and civil rights claims only." *Thaddeus-X*, 175 F.3d at 391. Thus, any

- 12 -

impairment in his ability to meet a deadline in prison misconduct or prison grievance proceedings does not implicate Plaintiff's right of access to the courts.  In short, Plaintiff has failed to allege any circumstances in which Defendants or their policies have caused "actual injury" to a non-frivolous claim.  Consequently, he has not pleaded an access-to-the-courts claim.

### 2. First Amendment (freedom of speech)

Plaintiff claims that the change in the prison's policies impairs his freedom of speech, including his right to criticize government officials.  (Am. Compl., Page ID#53.)  According to Plaintiff, the DOM "purports to regulate time, place, and manner of expressive or communicative conduct." (*Id.* at Page ID#58.)  It does no such thing.  It potentially reduces the amount of time that Plaintiff might receive for conducting legal research in the law library; it does not regulate his speech, communication or other expressive conduct, and it does not prevent him from criticizing public officials.  Indeed, Plaintiff himself makes clear that the computer workstations available for use with the ELL perform a limited function.  They provide access to a legal research database; prisoners are not able to use them for taking notes, preparing documents, or engaging in any form of protected speech or communication.  (*See id.* at Page ID##92, 94.)  In short, Plaintiff offers no facts from which to infer that his ability to exercise his First Amendment rights have been impaired. Accordingly, he does not state a First Amendment violation.

### 3. Fourteenth Amendment (Privacy)

Plaintiff asserts various privacy-related claims due to the fact that the DOM authorizes the transition from hard copy legal research materials to an electronic system.  Among other things, Plaintiff asserts that requiring him to use the ELL:

> effectively removes the responsibility [for the MDOC to provide legal materials] and replaces it with multiple hindrances and a private third party . . . website; subject to internal and external privacy concerns by a computer based network being the only form of research available to prisoners, *e.g.* browser tracking, recorded memory,

> computer network backdoor access, high jacking the browser, e[t]cetera without
> consent or knowledge.  These concerns are real and present in a network, and now
> they are monitored and metered in ready form, without resort to the privacy found
> in "hard copy" research.

(Am. Mot. for TRO, docket #6, Page ID##24-25.)  In other words, Plaintiff is apparently concerned

that the ELL creates a risk that third parties could access information about his legal research

through illicit means, such as "browser tracking, recorded memory, computer network backdoor

access," and "high jacking the browser."  (*See id.*)

Even assuming that the ELL discloses information about Plaintiff's research activity

to a third party, such disclosure does not violate his constitutional rights.  The Sixth Circuit

recognizes a right to informational privacy under the Fourteenth Amendment, but unlike other

circuits, "'[it] has developed and applied a different approach to assessing informational privacy

claims' that 'requires that the asserted privacy interest implicate a fundamental right.'"  *Lee v. City

of Columbus*, 636 F.3d 245, 259 (6th Cir. 2011) (quoting *Lambert v. Hartman*, 517 F.3d 433, 442

(6th Cir. 2008)).  The court has repeatedly rejected the idea that there is "a general constitutional

right to non-disclosure of private information."  *Wilson v. Collins*, 517 F.3d 421, 429 (6th Cir.

2008); *see, e.g.*, *Lee*, 636 F.3d at 261 (city's requirement that employees returning from sick leave

disclose the "nature of [their] illness" to their immediate supervisors does not implicate a

fundamental right); *Summe v. Kenton Cnty. Clerk's Office*, 604 F.3d 257, 270-71 (6th Cir. 2010)

(county's release of medical record of deputy county clerk to citizen pursuant to open records

request did not implicate a right fundamental or implicit in the concept of ordered liberty so as to

violate constitutional right to privacy); *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 591 (6th

Cir. 2008) (school's disclosure of information to Children Services not a violation of plaintiff's

constitutional rights); *Barber v. Overton*, 496 F.3d 449, 455-57 (6th Cir. 2007) (release of guards'

birth dates and social security numbers did not rise to constitutional level); *Coleman v. Martin*, 63

- 14 -

F. App'x 791, 793 (6th Cir. 2003) (dissemination of prisoner's mental health records to parole board was not a constitutional violation); *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995) (disclosure of rape victim's medical records to an inmate did not violate her constitutional privacy rights); *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir. 1981) (constitutional rights not violated by dissemination of juvenile delinquents' social histories to various agencies).

A plaintiff alleging a violation of his right to informational privacy must demonstrate that "the interest at stake relates to 'those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty.'" *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998) (quoting *DeSanti*, 653 F.2d at 1090). Only after a fundamental right is identified should the court proceed to the next step of the analysis–balancing the government's interest in disseminating the information against the individual's interest in keeping the information private. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (6th Cir. 1998). Applying these standards, the Sixth Circuit has recognized an informational-privacy interest of constitutional dimension in only two instances: (1) where the release of personal information could lead to bodily harm, *see Kallstrom*, 136 F.3d at 1061; and (2) where the information released was of a "sexual, personal, and humiliating nature." *See Bloch*, 156 F.3d at 684; *see also Lambert*, 517 F.3d at 440.

Plaintiff's asserted interest in the privacy of his legal research does not concern information that could lead to bodily harm or information of a sexual, personal, and humiliating nature. Thus, he does not have a constitutional right to protect the privacy of that information and to prevent its disclosure to private parties.

### 4. Fourth Amendment

Plaintiff also contends that the ELL subjects him to an unreasonable search and seizure in violation of the Fourth Amendment, because prison officials monitor his clickstream data

on the ELL.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., Amend. IV.  The Fourth Amendment is implicated when the government intrudes into an area "in which there is a 'constitutionally protected reasonable expectation of privacy.'"  *New York v. Class*, 475 U.S. 106, 112 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  Courts generally give prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  *See Turner v. Safley*, 482 U.S. 78, 84-91 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  Consequently, the Supreme Court has held that prisoners have no reasonable expectation of privacy in their cells.  *See Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984).  In addition, they do not have the right to be present when their cells are searched.  *See Bell*, 441 U.S. at 557.

Plaintiff ostensibly claims that he has a reasonable expectation of privacy in the "clickstream data" generated by usage of the ELL, which consists of data about the cases, statutes and other materials that he has retrieved, and the amount of time he spent reviewing them.  A "search" of that information is a minimal intrusion on a prisoner's privacy.  As Plaintiff himself recognizes, prisoners must provide that sort of information when requesting specific legal materials from the prison librarian.[2]  (*See* Am. Compl., Page ID#113.)  No court has held that a "search" of that sort of information violates the Fourth Amendment. *See Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996) (search of legal papers in prisoner's cell is constitutional); *Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998) (search of prisoner's law library desk, memory in typewriter,

---

[2] According to MDOC Policy Directive 05.03.115 (effective Nov. 1, 2010), "prisoners in Security Level I of institutions with more than one security level" are allowed to visit the main law library or request items to be delivered to their cells.  *Id.* ¶ P.  Prisoners in segregation cannot visit the main law library, and must request items from the law library to be delivered to their cells.  *Id.* ¶ R.

and crate containing legal materials not unlawful, because a prisoner has "limited rights to privacy");
*see also Davis v. Chapple*, No. 07-cv-321, 2009 WL 6312502, at *9 n.9 (N.D.N.Y. Nov. 4, 2009)
("Generally, disclosure of legal documents, whether it be . . . case law, legislation, or other legal
research, is not a violation of privacy because the documents are all a matter of public record.").
If prisoners do not have a reasonable expectation of privacy with regard to the cases, statutes and
other legal materials that they have selected for research in their cells, it follows that they do not
have a reasonable expectation of privacy with regard to the clickstream data generated by their
research activity on the ELL.

Moreover, in *Hudson*, the Supreme Court based its holding on the recognition that
the privacy rights of prisoners are inconsistent with the concept of incarceration and the needs of
penal institution.  468 U.S. at 527-28.  Similarly, recognizing a constitutional right to privacy in this
case would be inconsistent with the prison's need to monitor and control the usage of resources that
must be shared by many prisoners.  Thus, Plaintiff does not state a Fourth Amendment claim.

### 5.  Fifth Amendment

Plaintiff asserts that requiring him to use the ELL for legal research impinges on
his right to be free from compulsory self-incrimination; however,  "a violation of the constitutional
right against self-incrimination occurs only if one has been compelled to be a witness against
himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (citations omitted); *see
also McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005) ("It is only once compelled
incriminating statements are used in a criminal proceeding . . . that an accused has suffered the
requisite constitutional injury for purposes of a § 1983 action.").  Nothing about the policy or
practices challenged by Plaintiff compels him to make incriminating statements that may be used
against him in a criminal case.  Indeed, he offers no facts to support a plausible inference that it

would even be possible for the clickstream data monitored by prison officials to contain incriminating information. Moreover, he does not contend that any such information has been used against him in a criminal proceeding. Thus, he does not state a claim.

Plaintiff also contends that the ELL violates his right to counsel during a custodial interrogation. The right to counsel during a custodial interrogation derives from the Fifth Amendment right not to be compelled to give incriminating information. *See Miranda v. Arizona*, 384 U.S. 436, 469-70 (1966). As Plaintiff does not allege facts from which to infer that he has been compelled to give incriminating statements, he cannot contend that his right to counsel has been violated. For all the foregoing reasons, therefore, Plaintiff does not state a claim under the Fifth Amendment.

### 6. Sixth Amendment

Plaintiff also claims that usage of the ELL violates his right to maintain the privacy of attorney-client communication, ostensibly because activity on the ELL is monitored by prison staff. "[T]he confidentiality of the attorney-client relationship is entitled to protection even where the client is a prisoner." *Krilich v. Federal Bureau of Prisons*, 346 F.3d 157, 159 (6th Cir. 2003). The Sixth Amendment "protect[s] the attorney-client relationship from intrusion in the criminal setting." *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974). In addition, courts have held that the inspection of a prisoner's correspondence with his attorney, or other legal correspondence (i.e. legal mail), could "unjustifiably chill the prisoner's right of access to the courts or impair the right to be represented by counsel." *See Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003) (discussing inspection of incoming legal mail). Plaintiff's claim is without merit, however, as he contends that the ELL workstations do not allow prisoners to create or store documents. They are only capable of retrieving cases, statutes and other legal materials. In other words, the ELL cannot be used for

creating or sending any form of communication or legal document; thus, monitoring its usage cannot intrude on the attorney-client relationship or impair his right to be represented by counsel.

### 7. Eighth Amendment

Plaintiff asserts that the DOM violates his rights under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Reducing the minimum amount of time allotted to prisoners for legal research and implementing the ELL is not punishment and did not deny Plaintiff a minimal civilized measure of life's necessities. Thus, he does not state an Eighth Amendment claim.

### 8. Due Process

Plaintiff asserts that implementing the ELL and disposing of hard-copy legal materials deprives him of a protected interest without due process of law. The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under

the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  Plaintiff's claim is without merit because he was not deprived of a protected property or liberty interest.

Plaintiff asserts that he has a property interest in the hard-copy legal materials that will be destroyed or disposed of after implementation of the ELL, because some of these materials were purchased through the prisoner benefit fund.  MDOC Policy Directive 04.02.110 requires each state prison facility to create a fund (the "Prisoner Benefit Fund" or "PBF") derived from sources approved by the Correctional Facilities Administration, including: profits from the prisoner store, vending machines, and PBF-funded copy machines; interest from invested funds; contributions; organizations or individuals other than prisoners; confiscated prisoner funds; proceeds from hobbycraft sales; approved fund raising activities; and other approved sources.  *Id.* ¶ C (effective Aug. 1, 2010).  The funds in the PBF must be used for the benefit of prisoners, in accordance with the recommendations of a committee comprised of prisoners and prison staff; most expenditures from the fund require the approval of the warden of the facility.  *Id.* ¶¶ B, G.  The fund may be used to purchase law library items, but those items are to remain part of the library until they are worn out or replaced, unless the law librarian and a majority of the PBF committee agrees to eliminate them.  MDOC Policy Directive 05.03.115 ¶ D (effective Nov. 1, 2010).

Assuming that some of the legal materials at Plaintiff's prison facility were purchased using PBF funds,  Plaintiff does not have a protected property interest in those funds, or in any items purchased with them.  "Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med. Prof's Corp.*, 438 F. 3d at 611 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577

(1972) (internal quotation marks omitted)).

> Although property rights are principally created by state law, "whether a
> substantive interest created by the state rises to the level of a constitutionally
> protected property interest is a question of federal constitutional law."
> *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir. 1995). "Property
> interests protected by the due process clause must be more than abstract
> desires or attractions to a benefit. The due process clause only protects those
> interests to which one has a legitimate claim of entitlement." *Brotherton v.
> Cleveland*, 923 F.2d 477, 480 (6th Cir. 1991) (citations and internal quotation
> marks omitted).

*Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).

Nothing in the MDOC's policies indicates that Plaintiff has a legitimate claim of

entitlement to the legal materials purchased by the PBF. The materials are purchased for the benefit

of all the prisoners at the facility. Furthermore, the policies expressly indicate that these materials

are to remain available for use in the law library until they are worn out, replaced, or disposed of by

the law librarian and the PBF committee. In other words, they cannot be Plaintiff's personal

property, because he does not have the right to determine how they are used or disposed of.

Consequently, Defendants did not deprive him of a property interest in those materials when they

decided to replace them with an electronic system. *Cf. Coleman v. McGinnis*, 843 F. Supp. 320, 324

(E.D. Mich. 1994) (concluding that prisoner-plaintiffs did not possess a protected property interest

in the PBF).

To the extent Plaintiff claims that the changes implemented by the DOM implicate

a protected liberty interest, his claim is also without merit. The Supreme Court long has held that

the Due Process Clause does not protect every change in the conditions of confinement having an

impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515

U.S. 472(1995), the Court set forth the standard for determining when a state-created right creates

a federally cognizable liberty interest protected by the Due Process Clause. A prisoner is entitled

to the protections of due process only when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). In *Sandin*, the Court concluded that placement in administrative segregation did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91(6th Cir. 1995). Likewise, reducing the hours in which Plaintiff can use the law library, or requiring him to use the ELL instead of hard copy materials, does not impose an atypical and significant in relation to the ordinary incidents of prison life. Thus, the DOM does not implicate Plaintiff's liberty interests.

Because Plaintiff does not allege that he was deprived of a protected property or liberty interest, he does not state a due process claim. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) ("Without a protected liberty or property interest, there can be no federal procedural due process claim.").

### 9. Equal Protection

Plaintiff also claims that the DOM violates his right to equal protection because "he is a member of [a] class of individuals with a discriminatory animus being racial, gender, religious, and those who join together to assert certain fundamental constitutional rights or liberty interest in direct appeals, habeas corpus and 42 USC 1983." (Am. Compl., Page ID#50) He asserts that the policy is discriminatory because it "favors Michigan citizens over non-residents from other states[.]" (*Id.* at Page ID#72.)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; *City*

*of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Plaintiff's allegations are wholly conclusory.  The DOM does not treat prisoners different on account of their state citizenship, and there are no specific factual allegations indicating that Defendants have applied it in an intentionally discriminatory manner.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

### B.  42 U.S.C. § 1985, 1986

Plaintiff also cites §§ 1985 and 1986 as a basis for his claims.  Although Plaintiff does not indicate which of the three subsections of § 1985 is at issue, he is presumably relying on subsection (3), which prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws."

To maintain a cause of action under 42 U.S.C. § 1985(3), a plaintiff must establish the following four elements:   (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.   *See Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)).  The plaintiff further must demonstrate that the conspiracy was motivated by a class-based animus, such as race.  *Johnson*, 40 F.3d at 839; *see also Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996); *Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992); *Wolotsky v. Huhn*, 960 F.2d 1331, 1338 (6th Cir. 1992).  "Conspiracy claims, even those brought via § 1985, must be pleaded with specificity."  *Perry v. Se. Boll Weevil Eradication Found., Inc.,* 154 F. App'x 467, 477 (6th Cir. 2005).  Plaintiff has not alleged any facts supporting a conspiracy motivated by racial or class-based animus.  Accordingly, Plaintiff's claim under § 1985 will be dismissed.

42 U.S.C. § 1986 imposes liability on persons who are aware of and can prevent violations of 42 U.S.C. § 1985.  In order to show a violation of § 1986, the plaintiff must prove a valid claim under 42 U.S.C. § 1985.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314-15 (6th Cir. 2005).  Because Plaintiff has not pleaded a valid § 1985 claim, he fails to state a claim under § 1986.  *See id*.

### C.  ADA / RA

Plaintiff asserts that Defendants have violated the ADA and RA.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

> To make out *a prima facie* case under Title II of the ADA, a plaintiff must establish that (1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program or service solely because of [his] disability.

*Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003).  The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates.  *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs).  The proper defendant under a Title II claim is the public entity or an official acting in his official capacity.  *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002).  Plaintiff has named MDOC officials in their individual and official capacities.

- 24 -

The State of Michigan (acting through the MDOC) is not necessarily immune from Plaintiff's claims under the ADA.  The ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the Fourteenth Amendment[.]"  *United States v. Georgia*, 546 U.S. 151, 159 (2006).  If conduct violates the ADA but not the Fourteenth Amendment, then the Court must determine whether the ADA validly abrogates state sovereign immunity.  *Id.*  At this stage of the proceedings, the Court will presume that the ADA validly abrogates state sovereign immunity for Plaintiff's ADA claims.

Section 504 of the Rehabilitation Act protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs or activities "solely by reason of her or his disability." 29 U.S.C. § 794(a).  A "program or activity" includes the operations of "a department, agency, . . . or other instrumentality of a State . . . ."  29 U.S.C. § 794(b)(1).  The requirements for stating a claim under the RA are substantially similar to those under the ADA, but the RA specifically applies to programs or activities receiving federal financial assistance.  By accepting these funds, states waive sovereign immunity from claims under the RA.  *Nihiser v. Ohio EPA*, 269 F.3d 626, 628 (6th Cir. 2001).  For purposes of this Opinion, the Court will assume that the MDOC receives federal assistance for the prison programs and activities at issue in this case.

Because the standards for stating a claim under the ADA and RA are so similar, the Court will examine these claims together.  *See Thompson v. Williamson Cnty.*, 219 F.3d 555, 557 (6th Cir. 2000) ("Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act . . . claims brought under both statutes may be analyzed together."); *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) ("Because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other."); *see also Owens v.*

*O'Dea*, No. 97–5517, 1998 WL 344063, at *2 (6th Cir. May 27, 1998) ("Congress has dictated that Title II of the ADA be interpreted in a manner consistent with section 504 of the RA.") (citing 42 U.S.C. §§ 12134(b), 12201(a)).   At this stage of the proceedings, the Court will assume that Plaintiff's cognitive and physiological impairments qualify as a disability under the ADA and RA.

The benefit, program or service at issue in this case is the law library and access to materials for legal research.  The DOM challenged by Plaintiff reduces the hours that prisoners may be allotted for using the law library, and takes steps toward implementing the ELL.  This policy is not discriminatory on its face.  Its hourly limits apply all prisoners, disabled and non-disabled alike. In addition, the ELL is available for use by all prisoners in the general prison population.

Plaintiff contends that Defendants' implementation of the ELL violates the ADA/RA. Specifically, Plaintiff asserts that the MDOC re-modeled the law library but failed to follow ADA design standards for alterations to the facility.  *See* 28 C.F.R. § 35.151 et seq.  For instance, Plaintiff contends that the seating is inadequate because none of the workstations are specifically designated for prisoners in wheelchairs or for prisoners who need a companion.  Instead, seating is assigned on an "ad hoc" basis.  (Am. Compl., Page ID#104.)  Plaintiff cites 28 C.F.R. § 35.151(g)(1), which requires that wheelchair spaces and companion seats be dispersed in all accessible levels of "stadiums, arenas, and grandstands."   But the law library is obviously not a stadium, arena, or grandstand.

Plaintiff also cites 28 C.F.R. § 35.138(e)(1)(iii), although he concedes that this provision is "not exactly on point."  (Am. Compl., Page ID#104.)  He is correct, because the latter applies to the sale and release of tickets for accessible seating, *see* 28 C.F.R. § 35.138(e), which is not at issue in this case.

Even if the foregoing regulations were applicable, Plaintiff's claim fails because he does not allege any circumstances in which an "ad hoc" method of assigning seats negatively impacts disabled prisoners relative to prisoners who are not disabled. It does not necessarily follow that prisoners in wheelchairs have more limited access to the ELL workstations simply because none of the workstations have been set aside for them. In other words, if all of the workstations are capable of being used by prisoners in wheelchairs, then such prisoners are equally affected by a policy of assigning seats as they are available.

Moreover, Plaintiff does not allege facts indicating that the lack of designated seating negatively impacts him, personally. He does not allege that he uses a wheelchair or requires special seating in order to use the ELL. In fact, he acknowledges that he can walk, albeit with some difficulty. Even if the lack of appropriate seating affects other prisoners, Plaintiff cannot assert claims on their behalf. As a layman, Plaintiff may only represent himself with respect to his individual claims, and may not act on behalf of other prisoners. *See O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973); *Lutz v. LaVelle*, 809 F. Supp. 323, 325 (M.D. Pa. 1991); *Snead v. Kirkland*, 462 F. Supp. 914, 918 (E.D. Pa. 1978).

Plaintiff also contends that it is improper for the MDOC to assign staff to train prisoners in how to use the ELL. He asserts that they are not appropriate "auxiliary aids," because they are not "an appropriate person with whom the public entity should communicate," and thus, they are not "as effective as communications with others," citing 28 C.F.R. §§ 35.160(a)(1)-(2), 35.160(b)(1). (*See* Am. Compl., Page ID#112.) Here, Plaintiff mixes the definition of "companion" with the purpose of an "auxiliary aid." A companion is defined as any family member or other "associate" of the disabled individual who "is an appropriate person with whom the public entity should communicate." 28 C.F.R. § 35.160(a)(1)(2) (Mar. 15, 2011). In contrast, an auxiliary aid

- 27 -

or service is something a public entity provides "where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). In other words, a public entity may provide auxiliary aids, but it does not provide companions. Thus, it makes no sense to argue, as Plaintiff does, that prison staff and prisoner law clerks are inappropriate companions.

Plaintiff also conflates a general duty of the public entity subject to the ADA with the effectiveness of the entity's assistance. The public entity is required to "take appropriate steps" to ensure that its own communications with those who have disabilities are "as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In contrast, Plaintiff argues that working with prison staff or a prisoner law clerk impairs the effectiveness of his own communication, which is not a violation of 28 C.F.R. § 35.160(a)(1).

Plaintiff also asserts that disabled prisoners are treated differently because they are required to "continue to learn" to use the ELL with the assistance of prison staff or prisoner law clerks, whereas non-disabled prisoners are not required to do so. (Am. Compl., Page ID#112.) DOM 2014-31 indicates that "prisoners who are still not adept at using the ELL shall continue to learn with the assistance of law library staff and . . . prisoner law library clerks"; thus, it only requires prisoners to use the assistance of prison staff and prisoner library clerks to the extent needed to learn how to use the ELL. It is not a violation of the ADA/RA for the MDOC to provide more assistance to prisoners who need it, disabled or otherwise. Indeed, such assistance might fulfill the purpose of these statutes, which is to ensure equal access to, and "an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *See* 28 C.F.R. § 35.160(b)(1).

Plaintiff implies that requiring prisoners to rely on prison staff and prisoner law clerks deprives them of privacy in their legal research, and that because disabled prisoners may need more assistance, they are subject to a greater intrusion on their privacy.  But the DOM only provides for assistance in learning how to use the ELL; it does not require prisoners to rely on law library staff or prisoner law clerks to conduct research.   Moreover, Plaintiff does not allege any circumstances in which his own privacy has been impaired, or in which his access to or usage of the ELL differs from other prisoners on account of his disability.

Plaintiff also implies that the MDOC did not develop a "transition plan" as part of its implementation of the ELL, or make that plan available for public inspection, citing 28 C.F.R. 25.150(d)(1).  (Am. Compl., Page ID#113.)  That section provides, in relevant part:

> In the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity . . . shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes. A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments. A copy of the transition plan shall be made available for public inspection.

28 C.F.R. § 35.150(d)(1) (May 21, 2012).  The Sixth Circuit has held that this provision is not enforceable via a private cause of action.  *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 914 (6th Cir. 2004).  Thus, it cannot be enforced by Plaintiff.

Plaintiff cites a number of other ADA regulations, but he does not allege facts that would explain their relevance to his case.  (*See* Am. Compl., Page ID##97-100.)  A conclusory assertion that Defendants violated these regulations is not sufficient to state a claim.  (*See, e.g.*, Am. Compl., Page ID#100 ("[I]t is patently obvious from the text that . . . the changes [Defendant Heyns] implemented failed to comply with . . . ADA regulations, first and foremost 28 CFR

35.130(b)(1)(iii) and 28 CFR 35.130(8) supra.").)   In short, even assuming that Plaintiff is a "qualified individual" under the ADA/RA, he fails to state a cognizable claim.  The DOM is not discriminatory on its face, and Plaintiff offers no allegations which would indicate that he has been discriminated against, or excluded from participation in, or denied the benefit of, law library services on account of his disability.

### D.  ECPA

Plaintiff contends that the librarians at his facility have a policy of monitoring usage of the ELL workstations, in violation of the ECPA.  Title I of the ECPA generally prohibits any person from intentionally intercepting or attempting to intercept any "wire, oral, or electronic communication."  18 U.S.C. § 2511(1)(a).  An "electronic communication" is defined broadly as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."  18 U.S.C. § 2510(12).  However, an "intercept" is defined as "the aural or other acquisition of the *contents* of any wire, electronic, or oral communication . . . ."  18 U.S.C. § 2510(4) (emphasis added). The "contents" of a communication refers to the "substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).  The terms "substance," "purport," and "meaning" "indicate that Congress intended the word 'contents' to mean a person's intended message to another (i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')."  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (quoting Webster's Third New International Dictionary 2279 (1981)). Reviewing these definitions in light of prior versions of the ECPA, the Ninth Circuit distinguishes between the "contents" of a communication and "record" information about that communication. *Id.*  "[T]he term 'contents' refers to the intended message conveyed by the communication, and does

not include record information regarding the characteristics of the message that is generated in the course of the communication," such as the identity of the parties to the communication and its duration. *Id.*

Plaintiff's claim under Title I of the ECPA fails because he does not allege that Defendants "intercepted" the "contents" of a communication. Plaintiff contends that prison librarians are able to access "clickstream data" generated by usage of the ELL, which contains "the time, order and duration the computer spent on each web page as well as which files were accessed and/or downloaded . . . i.e., Shepardized." (Am. Compl., Page ID##74, 88.) Such information does not convey the "substance, purport, or meaning" of a prisoner's communication. Instead, it merely provides "record information" about a prisoner's usage of the ELL. *Cf. In re Zynga Privacy Litig.*, 750 F.3d at 1105-09 (holding that the URL of a webpage is not the contents of a communication); *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009) (holding that information about a telephone call's "origination, length, and time" was not "contents" for purposes of § 2510(8), because it contained no "information concerning the substance, purport or meaning of [the] communication"); *Gilday v. Dubois*, 124 F.3d 277, 296 n.27 (1st Cir. 1997) (holding that a device that "captures electronic signals relating to the [personal identification number] of the caller, the number called, and the date, time and length of the call" does not capture the contents of communications and therefore "is not within the ambit of the Wiretap Act").

Plaintiff also refers to the Stored Communications Act (SCA), which is part of Title II of the ECPA, 18 U.S.C. § 2701 et seq. The SCA establishes civil liability for whoever:

(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or

(2) intentionally exceeds an authorization to access that facility;

and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system.

18 U.S.C. § 2701.  The foregoing provisions do not apply.  Even assuming that the ELL is a "facility through which an electronic communication service is provided," Plaintiff cannot claim that Defendants accessed their own facility without authorization.  *See* 18 U.S.C. § 2701(c)(1) (stating that the prohibition in § 2701(a) does not apply to conduct authorized by the provider of the electronic communication service).

Title II of the ECPA (the SCA) also generally prohibits a person or entity providing an "electronic communication service to the public," 18 U.S.C. § 2702(a)(1), or providing a "remote computing service," 18 U.S.C. § 2701(a)(2), from knowingly disclosing the "contents" of a communication. The term "contents" has the same meaning in the SCA as it does in Title I of the ECPA.  *See* 18 U.S.C. § 2711(1).  For the reasons discussed above, Plaintiff has not alleged that Defendants accessed the "contents" of a communication, let alone that they disclosed them.   Thus, Plaintiff also does not state a claim under the SCA.

### E. APA

Plaintiff makes a brief reference to the Administrative Procedure Act (APA), arguing that Defendants did not provide the required "notice or opportunity to be heard" before implementing the DOM or the ELL.  (Am. Compl., Page ID#114.)  Plaintiff ostensibly refers to the requirements for agency rule-making in 5 U.S.C. § 551 et seq, which provide that an "agency" promulgating regulations to give notice of proposed rules in the Federal Register, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).  After giving notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).  Plaintiff's claim is without merit because the APA applies to *federal* agencies.  *See* 5 U.S.C. § 551(1) (defining "agency" as an

"authority of the Government of the United states"). It does not apply to a state agency like the MDOC. For all the foregoing reasons, therefore, Plaintiff does not state a federal claim.

### VIII. Supplemental Jurisdiction

To the extent that Plaintiff asserts claims arising under state law, the Court declines to exercise its supplemental jurisdiction over such claims. *See Experimental Holdings, Inc. v. Farris* 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Consequently, Plaintiff's action will be dismissed.

### **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed. Plaintiff's claims arising under federal law will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's claims arising under state law will be dismissed because the Court declines to exercise supplemental jurisdiction over them.

An order and judgment consistent with this Opinion will be entered.


Dated: July 15, 2015                         _____/s/ Gordon J. Quist_____
                                             GORDON J. QUIST
                                             UNITED STATES DISTRICT JUDGE